# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
August 25, 2009 Session

## STATE OF TENNESSEE v. JAMES PARIS JOHNSON

**Appeal from the Criminal Court for Campbell County**
**No. 12043     E. Shayne Sexton, Judge**

—————————

**No. E2008-02555-CCA-R3-CD - Filed September 15, 2010**

—————————

The Defendant, James Paris Johnson, appeals his convictions by a jury in the Campbell County Criminal Court for aggravated assault, a Class C felony, and public intoxication, a Class C misdemeanor. The Defendant was sentenced as a Range III, persistent offender to twelve years in prison for the aggravated assault and to thirty days' incarceration for the public intoxication, to be served concurrently. The Defendant contends that (1) the evidence is insufficient to sustain his conviction for aggravated assault, (2) the trial court erred by sentencing him as a Range III, persistent offender; and (3) he was denied the effective assistance of counsel. We hold that the trial court erred by sentencing the Defendant as a Range III, persistent offender. We affirm the Defendant's convictions, but we remand the case for resentencing for the aggravated assault conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Reversed in Part; Case Remanded**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Martha J. Yoakum, District Public Defender, and Charles Albert Herman, Senior Assistant Public Defender (at trial), and Kathy Parrott, Jacksboro, Tennessee (on appeal), for the appellant, James Paris Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; William Paul Phillips, District Attorney General; Michael Olin Ripley, Senior Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the Defendant's conviction for the aggravated assault of Chris Vulganore. At the trial, Mr. Vulganore testified that at about 5:00 p.m. on September 19, 2003, he and his sister and brother-in-law, Patty and Paul Matheney, were having a late lunch at the restaurant at Sugar Hollow Boat Dock in Campbell County. He said that although he was a resident of Kentucky, he came to Tennessee often to visit his family. He said that he had not met or spoken to the Defendant before that day.

Mr. Vulganore testified that the Defendant, two men, and a woman entered the restaurant and were seated about twenty to twenty-five feet away at a table to his left. One of the men asked him if he knew the type of fish that was mounted on the wall. Mr. Vulganore said that he thought it was a tarpon but that his brother-in-law thought it was something else. He said he and the man discussed the fish for a few seconds and the conversation ended. He said that about eight to twelve minutes later, as he was finishing his meal, he was struck on the back and side of his head. He said he was stunned and was not sure what was happening. He said he heard his sister ask something such as, "Why did you hit my brother?" Mr. Vulganore said that the Defendant stepped close to his side and that he grabbed the Defendant's left wrist and placed it in a wrist lock. He said he knew he had to stand or he would be hit again. He said he placed his hand on the Defendant's chest as he rose. He said the Defendant reached into his pocket and said he was going to cut the victim's "frigging throat." He said he shoved the Defendant back and told the Defendant they should go outside if the Defendant wanted to fight. He said that the Matheneys started to step between them and that the owner of the restaurant, Charles "Charlie" Stout, ran to them and pushed them apart. He admitted that he did not see who hit him until after he had been struck. He said he not see a knife at that point.

Mr. Vulganore testified that Stout told him to sit down about three times and then took the Defendant out the right side door. He said he could see the Defendant and Stout through the windows. He said he could not hear well at first because the door was closed. He said he next saw the Defendant waving a knife and heard the Defendant screaming, although the Defendant's words were unintelligble. He said he believed the Defendant was trying to return to the restaurant. He said he remarked about the Defendant, "He's gonna get his self cut." He said he believed at the time that if the Defendant could have gotten past Stout, the Defendant would have come inside the restaurant to "get" him. He said he looked around "for a chair or something" because he believed the Defendant was going to come into the restaurant. He said he observed the Defendant's trying to get past Stout and walking around the building to try coming in through another door. He said it looked as if Stout were trying to talk to the Defendant and calm him. He said the Defendant never came back inside the restaurant.

Mr. Vulganore testified that the police arrived and that one officer had a dog and another officer placed his hand on his gun. He said the Defendant still held the knife. He said he could not hear the conversation. He said that his head swelled slightly where he was struck but that he did not receive any medical treatment or miss work because of the injury. He said he did not know of any reason why the Defendant would have attacked him, threatened to cut him, or displayed the knife.

On cross-examination, Mr. Vulganore testified that two men and a woman sat with the Defendant and that he did not see who hit him. He said that when he was seated at the table at the restaurant, the Defendant's back was to him. He said the aisle was on the opposite side of where he was seated and that he did not notice the Defendant's walking toward him. He said that as soon as he was struck, the Defendant stepped beside him. He said he did not know if the Defendant hit him with a palm or a fist, but he said he was stunned "a little." He agreed that after he was struck, he grabbed the Defendant's left wrist, twisted the Defendant's hand around and down, and put his hand on the Defendant's chest. He said that as soon as he grabbed the Defendant's left wrist, the Defendant reached into the Defendant's right pocket and said he was going to cut the victim's throat. He agreed that at the preliminary hearing he testified that after he released the Defendant's arm, he asked the Defendant, "What the hell is going on?" He said that by the time Stout reached them, he no longer had hold of the Defendant. He said that after Stout and the Defendant went outside, he did not continue his meal but stood and watched. He did not remember a partition in the restaurant, and he said that the view was open in front of him all the way to the wall. He said it took the police between eight to fifteen minutes to arrive. He said that he drank two beers with his dinner but that his sister and brother-in-law did not drink any beer.

Paul Matheney testified that he resided in Ohio but that he had owned property in Campbell County for about twelve years. He said that he visited the property about three times a month. He said that before September 19, 2003, he had been to the restaurant at Sugar Hollow Boat Dock several times. He said that he did not know the Defendant and had never seen the Defendant before September 19. He said that one man and one woman accompanied the Defendant. He said the Defendant struck the victim in the face and said, "You better watch your mouth," or, "Watch what you're saying." He said the victim grabbed the Defendant's wrist, stood, and asked, "What are you doing?" Mr. Matheney said that the Defendant replied, "I'll cut your head off, I'll slit your throat," and that the Defendant "kept pawing at his pocket." He said the Defendant did not pull out a knife. He said that the victim released the Defendant and pushed the Defendant away. He said he was trying to keep his wife, the victim's sister, from getting between the Defendant and the victim. He said that Stout ushered the Defendant out the front door of the restaurant. He said the Defendant tried to return to the restaurant.

Mr. Matheney testified that the Defendant pulled a knife and Stout said, "You're not coming back in the building." He said that Stout tried to get the Defendant to return to his boat. He said that the Defendant started to leave but then went to the back door in an attempt to reenter the restaurant and that Stout stopped him. He said the Defendant returned to the front of the restaurant, waving his knife and yelling that he was going to slit the victim's throat and cut off the victim's head. He said that his wife called the police and that he was present when they arrived. He said he did not see what occurred between the police and the Defendant. He said the Defendant did not threaten him, his wife, or Stout. He said that during the conversation about the fish on the wall, the Defendant "never said a word."

On cross-examination, Mr. Matheney testified that the victim was hit "in the face . . . up the side of the head." He said that Stout did not stay outside with the victim the entire time, but walked into the restaurant and back outside a few times. He said that he was able to hear "bits and pieces" of the conversation between the Defendant and Stout. He confirmed that the victim never went outside and that the Defendant never came inside. He guessed it took the police ten to fifteen minutes to arrive. He said that he had not finished his meal and did not resume eating until after the Defendant was arrested.

Patricia Matheney testified that the victim was her brother. She said the Defendant came into the restaurant alone and joined two men and a woman who were already seated. She said that after the conversation about the fish, the man who had asked about it apologized for interrupting their dinner. She said there was no argument or disagreement. She said that when she was seated, her back was to the Defendant. She said she saw the Defendant walk beside her, reach out, and hit the victim once. She said the sound of the blow was louder than a slap. She said she also heard the Defendant say he was going to cut the victim. She said that she did not see a knife but that the Defendant "fumbled in his pocket." She said that after Stout pulled the Defendant outside, she was able to view clearly what happened. She said she went to stand "right in front of the doors," and she could hear every word being said. She said the Defendant said, "I'm going to slit his f------ throat from here to here," and pulled a knife out of his pocket and opened it. She said that Stout told the Defendant, "No, no, no, no, we're not gonna do that." When asked whether the Defendant tried to re-enter the restaurant, she said that he paced back and forth between the restaurant doors, that he tried to enter the back door, and that Stout stopped him. She said that she asked a woman at the restaurant to use a telephone and that she called the police. She said the Defendant did not threaten her, Mr. Matheney, or Stout, although he was "aggressive" toward Stout.

On cross-examination, Ms. Matheney testified that the Defendant struck the victim with "a very hard slap across the face" but that the blow did not knock the victim out of the chair. She said that although she walked up to the front door, everyone else stood behind her.

-4-

She said that Stout never came back inside the restaurant and that the victim did not leave the restaurant until the police arrived. She said that she did not go outside until the Defendant was apprehended.

Deputy Darrell Monger of the Campbell County Sheriff's Office testified that he responded to the call at the Sugar Hollow Boat Dock on September 19, 2003, between 5:00 p.m. and 6:00 p.m. He said auxiliary deputy Josh Monday, who was no longer employed by the sheriff's office at the time of the trial, rode with him. He said there had been a report that a man armed with a knife was on the dock. He said he harnessed his K-9 dog. He said a long ramp led to the main dock area. He said that as he walked down to the main dock, he saw a woman standing behind the closed door at the front of the restaurant, pointing to his right. He said he and the dog walked to the right of the dock, with Deputy Monday following behind, and saw the Defendant standing close to the boat slips. He said that a small section of dock led from the main dock to the boat slips and that he had to cross that section to reach the Defendant. He said the Defendant was waving a knife back and forth and repeating, "I'll kill the son of a b----." He said that he told the Defendant to drop the knife in a forceful voice but that the Defendant refused. He said he reluctantly released his dog because he was afraid that the dog and the Defendant would end up in the water and that someone might drown. He said he pleaded with the Defendant for "another minute or so." He said that the Defendant never dropped the knife but that the Defendant folded the knife and handed it to him. Deputy Monger identified the knife as the one he retrieved from the Defendant, and it was received into evidence.

Deputy Monger testified that the Defendant had a strong odor of alcohol. He said that after he took the Defendant into custody, he and Deputy Monday had to help him balance because he staggered. He said they had to help him "quite a bit" to get up the ramp to the patrol car. He said the Defendant's speech was slurred. He said no other force was required to subdue the Defendant. He said that he did not observe any injuries or marks on the Defendant.

Deputy Monger testified that he appeared in Campbell County Criminal Court on August 24, 2004, in anticipation of the trial of this matter. He said the trial did not take place that day because the Defendant failed to appear. The order setting the trial for August 24, 2004, and the order of conditional forfeiture on bond reciting the Defendant's absence from court that day were received into evidence.

On cross-examination, Deputy Monger testified that he could not remember how long it took him to respond to the call at Sugar Hollow Boat Dock. He said that the main dock included the restaurant and store and that a walkway surrounded them. He said that a ramp

connected the main dock to the boat slips and that the Defendant was near the boat slips. He said that neither he nor Stout charged the Defendant with assault.

The Defendant did not testify or present any witnesses on his behalf. The jury was instructed on the charged offense of aggravated assault and on the lesser included offenses of attempted aggravated assault, assault, and attempted assault. The jury convicted the Defendant of aggravated assault and of public intoxication.

**I**

The Defendant contends that the evidence is insufficient to support his conviction for aggravated assault because the victim was not within the "zone of danger" when he displayed his knife and because, as a result, the victim was not in imminent fear of death or bodily harm. The State contends that the "zone of danger" theory is inapplicable to aggravated assault and that the evidence is sufficient to support the Defendant's conviction. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This means that we may not reweigh the evidence, but must presume that the jury resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

The offense of aggravated assault as charged in this case required that the State prove beyond a reasonable doubt that (1) the Defendant "[i]ntentionally or knowingly cause[d] another to reasonably fear imminent bodily injury[,]" and that (2) the Defendant "use[d] or display[ed] a deadly weapon . . . ." T.C.A. §§ 39-13-101(a)(2), -102(a)(1)(B) (2003). A person acts intentionally when his conscious objective or desire is to engage in the conduct or cause the result. T.C.A. § 39-11-106(a)(18). A person acts knowingly when he is aware of the nature of his conduct or that the circumstances exist or that he is aware that his conduct is reasonably certain to cause the result. T.C.A. § 39-13-101(a)(20). A bodily injury includes a cut or disfigurement. T.C.A. § 39-11-106(a)(2). A deadly weapon is anything made, designed, or used for the purpose of inflicting death or serious bodily injury. T.C.A. § 39-11-106(a)(5)(A)-(B). Proof of a victim's fear may be inferred from circumstantial evidence. See State v. Stroud, No. W2006-01945-CCA-R3-CD, Shelby County (Tenn. Crim. App. Oct. 29, 2007) (citing State v. Larry Allen Whited and William Henry Rutherford, No. M2005-00167-CCA-R3-CD, Sumner County (Tenn. Crim. App. Mar. 7, 2006), app. denied (Tenn. Aug. 28, 2006)), app. denied (Tenn. Apr. 28, 2008).

Our supreme court has held that regarding the offense of reckless endangerment, "the term 'zone of danger' may be employed to define that area in which a reasonable probability exists that the defendant's conduct would place others in imminent danger of death or serious bodily injury if others were present in that zone or area." State v. Payne, 7 S.W.3d 25, 28 (Tenn. 1999). The zone of danger does not require the victim's knowledge of the imminent danger of death or serious bodily injury. Rather, the zone of danger can be applied in reckless endangerment cases to victims who are unaware of the danger. See State v. Moore, 77 S.W.3d 132, 135-36 (Tenn. 2002). In contrast, aggravated assault committed by placing one in reasonable fear of imminent bodily injury by use or display of a deadly weapon requires that the victim have a fear or a reasonable apprehension of being harmed. See State v. Jones, 789 S.W.2d 545, 550-551 (Tenn. 1990).

The Defendant acknowledges that Tennessee courts have not adopted a zone of danger approach for aggravated assault committed by placing one in reasonable fear of imminent bodily injury by use or display of a deadly weapon. He contends, however, that we should adopt a zone of danger approach in this context because "the same theory of a zone within which it is reasonable for one to be fearful of bodily injury should apply when a deadly weapon is displayed at a distance away from the victim."

Imminent danger is an immediate, real threat to one's safety. See Black's Law Dictionary (8th ed. 2004). Causing another reasonably to fear imminent bodily injury is an element of assault. See T.C.A. § 39-13-101(a)(2). An aggravated assault requires an assault and either serious bodily injury or the use or display of a deadly weapon. See § T.C.A. 39-13-102(a)(1)(A)-(B). The presence of danger element of reckless endangerment is not the same as the reasonable fear element of aggravated assault. See Moore, 77 S.W.3d at 135. The point at issue is not whether the victim was within a certain physical area within which he might be harmed even if he was unaware of the danger, but whether his fear of imminent bodily injury was reasonable. In order to create a reasonable fear, the danger of bodily injury to the victim must be imminent.

The restaurant owner had to physically remove the Defendant from the restaurant. The Defendant drew his knife and shouted that he was going to kill the victim and cut the victim's throat. The Defendant tried to enter the restaurant after being removed. The record reflects that only the restaurant owner's actions kept the Defendant from entering the restaurant where he could have attacked the victim. The Defendant's argument confuses the zone of danger in reckless endangerment with the element of reasonable fear of imminent bodily injury in aggravated assault. The victim's fear of imminent bodily injury in this case was reasonable, and we decline to apply a zone of danger approach to the aggravated assault in this case.

Taken in the light most favorable to the State, the evidence at the trial showed that the Defendant struck the victim in the head and told the victim he was going to cut the victim's throat. The Defendant reached into his pocket to retrieve his knife. The owner of the restaurant where the altercation occurred had to step between the Defendant and the victim and pull the Defendant from the building. The victim believed that the Defendant was going to gain entry to the restaurant and looked for a "chair or something" to defend himself. Outside the restaurant, the Defendant brandished his knife and made attempts to re-enter the building while shouting that he was going to kill the victim and cut the victim's throat. When the police arrived, the Defendant was still waiving his knife and threatening to kill the victim, although by this time the Defendant moved farther away from the restaurant. We conclude that a rational trier of fact could have found that the Defendant intentionally or knowingly caused the victim to fear imminent bodily injury by displaying the knife and threatening to kill the victim. We hold that the evidence is sufficient to support the Defendant's conviction for aggravated assault.

## II

The Defendant contends that the trial court erred in sentencing him as a Range III, persistent offender instead of as a Range II, multiple offender because the State did not submit certified copies of prior federal convictions at the sentencing hearing. The State contends that the trial court correctly determined that the Defendant's prior convictions established him as a Range III, persistent offender.

At the sentencing hearing on March 24, 2008, Misty Thompson, a probation officer, testified that she prepared the Defendant's presentence investigation report. She said she gave the Defendant a questionnaire and later interviewed him. She said the Defendant completed the questionnaire himself, although she made notes on it in a few places. She said that the Defendant listed several prior offenses, including five federal convictions and two state felony convictions. She said the federal convictions were for the following: bank robbery in 1967, possession of a firearm in 1974, possession of a firearm in 1976, escape in 1979, and "possession of a counterfeit" in 1981. She said the Defendant's state convictions were for escape in 1987 or 1988 and for second degree murder in 1988. She said that she obtained copies of the judgments of conviction from the Federal Probation Service but that she was unable to obtain certified copies due to their ages. The certified copies of the Defendant's state convictions were received into evidence, and the uncertified copies of the federal judgments were marked for identification.

Reverend Cecil Johnson testified for the defense that he was the Defendant's brother. He said that if the Defendant were allowed an alternative sentence, the Defendant would live in a furnished house next door to him. He said that if the Defendant were placed under house

arrest, he and two brothers who lived nearby would provide good support for the Defendant.

Reverend Johnson testified that the Defendant had undergone knee surgery, had a heart problem, and possibly had some type of cancer. He said he would transport the Defendant to a probation officer. He said that since the offenses, the Defendant was doing well and had been staying at home. He said the Defendant helped with their mother when she was dying. He said he and his family owned several businesses in the community, including an auto parts store, a home supply store, a tire store, and a lumber business.

On cross-examination, Reverend Johnson testified that his son owned the property where the Defendant would live. He said the Defendant lived at that house on occasion before the sentencing hearing, although he was "off" and "back some." He did not know where the Defendant went when he was not living at the house. He said that when the Defendant was released from prison the last time, the Defendant lived with their mother. He said that at the time of the offenses in this case, the Defendant lived on a houseboat. He said that the Defendant lived in the house next door from 2007 until he turned himself in. He said he was unaware that the Defendant had outstanding warrants or that the Defendant failed to appear at his first trial in August 2004.

The trial court stated that it considered the presentence report and the documents filed by both parties, and it sentenced the Defendant to thirty days in jail for public intoxication. The court refused to consider the federal judgments because the copies were not certified. However, the court relied on the Defendant's admissions in the presentence report concerning his federal convictions and found that the Defendant had sufficient convictions to be sentenced as a persistent offender. In addition, the court found that based on the persistent offender status, the Defendant was not a favorable candidate for alternative sentencing. Applying the 1989 Sentencing Act, the court found that enhancement factor (2) applied to the Defendant's sentence because the Defendant had prior convictions beyond those necessary to establish the appropriate range. See T.C.A. § 40-35-114(2) (2003) (amended 2005, 2007, 2008, 2009). The court found mitigating factor (1), that no serious physical injury occurred to a victim. See T.C.A. § 40-35-113(1) (2003). The court found that confinement was necessary to protect society from the Defendant in this case because he had a long history of criminal conduct and that measures less restrictive than incarceration had been applied frequently to the Defendant without success. The trial court sentenced the Defendant to twelve years in the Department of Correction.

The Defendant's judgments of conviction were filed on March 24, 2008. At a May 5, 2008 hearing, the State moved to supplement the record with certified copies of the Defendant's federal judgments of conviction, which were marked for identification at the sentencing hearing. The State informed the trial court that defense counsel was not present,

but the prosecutor said that he sent defense counsel notice of the hearing. The court granted the State's motion and supplemented the record with the certified judgments to "create[] a paper trail of his admissions . . . on the presentence report."

On June 23, 2008, the trial court set aside its May 5, 2008 order and again addressed the issue on the merits, with counsel for both parties present. In a written order filed June 27, 2008, the trial court granted the State's motion to supplement the record and stated that it had concluded all issues concerning sentencing in the Defendant's case.

The Defendant argues that this court's holding in State v. Charles Eberhardt alias McCoon Eberhardt, No. 03C01-9307-CR-00230, Hamilton County (Tenn. Crim. App. Feb. 17, 1994), prohibited the State from supplementing the record with certified copies of the federal judgments of conviction. In addition, the Defendant argues that he was tricked into providing information to the probation officer for the presentence report. The Defendant does not claim that the State failed to provide the proper notice that it sought a sentence outside the standard range. Instead, the Defendant challenges the form of the notice.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d) (2003). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> [T]he trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

On June 7, 2005, the General Assembly amended the Code sections 40-35-102(6), -114, -210, and -401. See 2005 Tenn. Pub. Acts ch. 353, §§ 1, 5, 6, 8. The amended statutes apply to sentencing for offenses committed on or after June 7, 2005. See T.C.A. § 40-35-210 (2006) Compiler's Notes. For offenses committed before that date, a defendant may elect to be sentenced pursuant to the amended Sentencing Act by executing a waiver of ex post facto protections. Id.

We note that an ex post facto waiver form is in the record on appeal. The Defendant's attorney completed the form, but the Defendant did not sign it. At the sentencing hearing, defense counsel stated that she advised the Defendant not to sign a waiver and that the Defendant elected to be sentenced pursuant to the pre-2005 Sentencing Act. In the hearing transcript, the trial court noted that the Defendant was being sentenced under the pre-2005 Act. However, the trial court filed a sentencing memorandum entitled "Sentencing Findings of Fact for Offenses Committed on or After June 7, 2005." In its brief, the State asserts that the record contains the Defendant's executed ex post facto waiver. The waiver was not executed because the Defendant did not sign it. Thus, the amended code sections are inapplicable to the Defendant's case because the offenses predate the amendments, and the Defendant did not execute an ex post facto waiver.

Under the law applicable to the Defendant, unless enhancement factors are present, the presumptive sentence to be imposed is the minimum in the range for a Class B, C, D, or E felony. T.C.A. § 40-35-210(c) (2003). Our Sentencing Act provides that, procedurally, the trial court is to increase the sentence within the range based on the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors. T.C.A. § 40-35-210(d), (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. T.C.A. § 40-35-210 (2003), Sent'g Comm'n Comments; State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986); see Ashby, 823 S.W.2d at 169.

The sentencing range for aggravated assault, a Class C felony, is three to six years for a Range I offender, six to ten years for a Range II offender, and ten to fifteen years for a Range III offender. T.C.A. § 40-35-112(b)(3), (c)(3) (2003). A multiple offender is a defendant who has received:

> (1) A minimum of two (2) but not more than four (4) prior felony convictions within the conviction class, a higher class, or within the next two (2) lower felony classes . . .; or

> (2) One (1) Class A prior felony conviction if the defendant's conviction is a Class A or B felony.

T.C.A. § 40-35-106(a). A persistent offender is a defendant who has received:

> (1) Any combination of five (5) or more prior felony convictions within the conviction class or higher, or within the next two (2) lower felony classes, . . .; or

> (2) At least two (2) Class A or any combination of three (3) Class A or Class B felony convictions if the defendant's conviction offense is a Class A or B felony.

T.C.A. § 40-35-107(a). For either a multiple offender or a persistent offender, a prior conviction includes "convictions under the laws of any other state, government or country which, if committed in this state, would have constituted an offense cognizable by the laws of this state." T.C.A. §§ 40-35-106(b)(5), -107(b)(5).

Persistent offender status requires a finding by the trial court beyond a reasonable doubt that the Defendant has the requisite prior felonies. Code section 40-35-202 provides:

> If the district attorney general believes that a defendant should be sentenced as a multiple, persistent or career offender, the district attorney general shall file a statement thereof with the court and defense counsel not less than ten (10) days before trial or acceptance of a guilty plea; provided, that the notice may be waived by the defendant in writing with the consent of the district attorney general and the court accepting the plea. The statement . . . must set forth the nature of the prior felony convictions, the dates of the convictions and the identity of the courts of the convictions. The original or certified copy of the court record of any prior felony conviction, bearing the same name as that by which the defendant is charged in the primary offense, is prima facie evidence that the defendant named therein is the same as the defendant before the court, and is prima facie evidence of the facts set out therein.

The statute requires at a minimum that the State file "(1) written notice, (2) clearly expressing the State's intention to seek sentencing outside of the standard offender range, (3) setting forth the nature of the prior felony conviction, the dates of the convictions, and the identity

-12-

of the courts of the convictions." State v. Livingston, 197 S.W.3d 710, 713-14 (Tenn. 2006). The purpose of the statutory notice requirement is to provide a defendant with fair notice that he or she is subject to greater than the standard sentencing range, to facilitate plea agreements, to enable the defendant to make an informed plea, and to aid trial strategy. State v. Adams, 788 S.W.2d 557, 559 (Tenn. 1990); State v. Taylor, 63 S.W.3d 400, 412 (Tenn. Crim. App. 2001). Our supreme court has held that "perfect" notice is not required, but fair notice must be provided. Livingston, 197 S.W. 3d at 713. This means that "when the State has substantially complied with Section 40-35-202(a), an accused has a duty to inquire about an ambiguous or incomplete notice and must show prejudice to obtain relief." Taylor, 63 S.W.3d at 412. However, the State's failure to file any notice is grounds for re-sentencing. State v. Carter, 121 S.W.3d 579, 585 (Tenn. 2003); see State v. Pender, 687 S.W.2d 714, 719-20 (Tenn. Crim. App. 1984).

A notice to seek enhanced punishment is not contained in the record. The record reflects that the State filed notices of its intent to offer evidence of other crimes, wrongs, or acts pursuant to Tennessee Rule of Evidence 404(b) and of its intent to impeach the Defendant with prior convictions under Tennessee Rule of Evidence 609(a)(3). In its 404(b) notice, the State listed the Defendant's failure to appear at trial on August 24, 2004, his flight to avoid prosecution, his subsequent arrest, the trial court's order of forfeiture of bond, and the sheriff's intake sheet. The State did not refer to the Defendant's prior federal or state convictions. In the 609(a)(3) notice, the State wrote that it intended to impeach the Defendant with his "prior convictions[,]" but the convictions it intended to use were not listed.

After conducting the presentence investigation, probation officer Misty Thompson filed a memorandum with the court listing the Defendant's federal record of convictions. Ms. Thompson wrote, "The following information was obtained from the U.S. Probation Office. This is the correct Federal Prior Record discovered and what the courts should consider in addition to the Claiborne County, TN convictions." In response, the Defendant filed a Motion in Limine and/or Motion to Strike Ms. Thompson's memorandum to the court because the memorandum did not comply with the notice requirements of Code section 40-35-202. At the sentencing hearing, defense counsel objected to the admission of the federal convictions because the State did not provide certified copies. Defense counsel stated that the State filed certified copies of only the Defendant's Tennessee convictions. The following exchange occurred:

THE COURT: Did you file a notice?

THE STATE: I filed a notice, your Honor, on the – with the discovery notice. It's in

the file, your Honor, in the enhancement notice. It lists the United States District Court as the Court of conviction, the date of conviction and the convictions themselves.

DEFENSE COUNSEL: Your Honor, I have Statute Number 40-35-202 that says, "The original or certified copy of the court record of any prior felony conviction bearing the same name as that by which the defendant is charged in the primary offense is prima facie evidence." And that's the only way he can get prima facie evidence in . . . the case law says that those certified copies make prima facie, and he doesn't have prima facie. He can't bring it in based on hearsay of what somebody read or what somebody talked to, because that's still hearsay . . . without those certified copies, he can't cure his hearsay, and . . . we're asking to go forward on these two convictions."

THE COURT: Well, I still – I still haven't found your notice, the –

THE STATE: It's in the –

THE COURT: I know – I'm familiar with the procedure. It would be on your discovery notice?

THE STATE: Yes, your Honor.

-14-

THE COURT:    Shasta, see if you can find a notice on there. It's the notice of discovery.

The record contains no evidence that the State's notice of discovery was ever found or filed. Pursuant to Code section 40-35-202, the notice of enhancement must be provided at least ten days before trial. Ms. Thompson's memorandum did not meet the threshold requirements of fair notice. Although the memorandum listed the Defendant's federal convictions, the dates of conviction, and the convicting courts, it did not clearly express the State's intention to seek sentencing outside of the standard offender range. See State v. Livingston, 197 S.W.3d at 713-14. The memorandum merely stated that the court should consider the convictions, not that the State sought to enhance the Defendant's punishment range. Because the State did not comply with the statutory notice requirement of Code section 40-35-202, the Defendant should not have been sentenced above the standard range. Therefore, the trial court erred when it enhanced the Defendant's punishment range based upon his prior convictions. As a result, it was also error for the trial court to accept certified copies of the federal judgments to support the improper enhancement of the Defendant's sentencing range. The Defendant must receive a new sentencing hearing as a Range I, standard offender.

## III

The Defendant contends that he received the ineffective assistance of counsel at the trial. The State contends that the Defendant's counsel was not ineffective. We agree with the State.

The Defendant filed a motion for new trial in which he alleged that one of the jurors was disqualified from serving because she resided in Kentucky, that he was prejudiced by trial counsel's lack of reasonable diligence in discovering that the juror resided in Kentucky, and that he was entitled to a new trial. In an amended motion for new trial, the Defendant contended that he received the ineffective assistance of counsel at the trial level and that the State's control of the court docket violated his constitutional and statutory rights.

At the hearing on the amended motion for new trial, the Defendant testified that he first met with appointed trial counsel in counsel's office. He said the meeting lasted ten minutes. He said that he informed counsel about witnesses to the incident at Sugar Hollow Boat Dock but that to his knowledge, counsel did not interview them. He said that in June 2007, after he turned himself in, counsel came to the jail at least twice, and perhaps three times. He said that he again told counsel about the witnesses, but he did not know their names. He said he suggested that trial counsel consult Charlie Stout, the restaurant owner.

-15-

He guessed the total amount of time he spent talking to counsel was between one and one-half and two hours.

The Defendant testified that a probation officer brought him a form and asked him to fill it out. He said that he asked if he needed his attorney but that the probation officer responded that she "didn't think so." He said the probation officer said that the form would not be used for anything other than expediting the presentence report and that nothing in it would be used against him. He said he did not see trial counsel during the meeting with the probation officer or during the time he took to complete the presentence questionnaire.

The Defendant testified that trial counsel did not call any witnesses. He said that counsel did not personally interview any witnesses but that counsel mentioned that a person from counsel's office spoke with Charlie Stout. He said that none of the people with whom he was seated at the restaurant were called as witnesses. He said that those people witnessed what occurred inside the restaurant but that they did not see what happened outside the restaurant. He said that if the other witnesses had testified, they could have offered a different story than the victim's account of the events.

On cross-examination, the Defendant testified that he knew only the first name of one of the men with whom he was eating that night. He said he helped sell the man a houseboat and the man was repaying him by buying dinner. He said that the man's name was Jerry and that Jerry was from out of state. He said the other two people at the table were Jerry's wife and her brother. He said they lived with Jerry on a houseboat.

The Defendant admitted that he had been convicted of second degree murder in Claiborne County. He also admitted that he had been convicted of escape. When asked whether he was contesting his conviction for bank robbery in a United States District Court, the Defendant replied that he felt he was being forced to testify against himself, but he acknowledged that he had been convicted. He also acknowledged two federal weapons convictions, a conviction for possession of counterfeit currency, and a federal escape conviction. He reiterated that regarding the preparation of the presentence report, the probation officer told him that she did not think he needed an attorney, that his answers were merely to expedite her completing the presentence report, and that nothing would be used against him. He said she told him the court would review the presentence report, but he did not agree that she told him that the court would make its sentencing decisions based on it. He agreed that he knew the trial court would see or hear everything in the presentence report. He acknowledged that he met "presentence or probation type" people once in 1967 in preparation for a sentencing hearing in federal court. He said he was sentenced to fifteen years in that case. He agreed that he spent a lot of time in court and with lawyers and was familiar with the criminal process. He would not agree that he was not surprised that his

prior criminal record was used at the sentencing. He said he was told it would not be used against him.

The Defendant testified that he remembered the name of the juror with the Kentucky address was Tammy Cupp. He said he did not know Ms. Cupp nor had he had any contact with her. He said that he was looking at the jury list while the jury was deliberating and noted that a juror had a Kentucky address. He said he notified counsel.

Bill Rutherford testified that he worked in law enforcement for thirty-eight years and that he was a retired police chief. He said that he served subpoenas on hundreds of people. He said that he was given a subpoena to serve which listed two addresses for Tammy Cupp—one in Jellico, Tennessee, and the other in Williamsburg, Kentucky. He said he found an empty mobile home at the Jellico address. He said he found a neighbor in Williamsburg, Kentucky, who knew Ms. Cupp, and he said he left the subpoena with the neighbor. Ms. Cupp called him the next day and accepted the subpoena. He said the neighbor told him that Ms. Cupp and her husband lived next door but that they were away from home and at property located between Jellico and Williamsburg, building a new house. He said the neighbor told him that Ms. Cupp had lived in Williamsburg for over a year. He said the Cupps' new house was located in Kentucky and that Ms. Cupp resided in Kentucky.

On cross-examination, Mr. Rutherford testified that he did not know whether Ms. Cupp had more than one residence. He said that he had been to the address in Jellico but that he did not investigate whether she had another residence in Tennessee. He said the subpoena came from the Defendant's attorney. He said that he only spoke with Ms. Cupp by telephone. He said he did know what she looked like and never personally served her with the subpoena. He admitted that what he knew about where Ms. Cupp resided was based upon the information he obtained from her neighbor.

Trial counsel testified for the State that he had been employed as an assistant public defender since 1990. He said that regarding the Defendant's claim of ineffective assistance of counsel, he tried his best to put on a defense. He said that the facts of the case showed that the victim was not in imminent danger of death or serious bodily injury. He agreed that this theory was the basis of his cross-examination and that he argued the issue before the jury. He said he discussed the case and possible defenses with the Defendant. He said that the Defendant did not testify because of his prior convictions.

Trial counsel testified the Defendant told him that the victim called the Defendant a "son of a b----," that the victim punched him in the stomach, and that the Defendant slapped the victim. He said that the Defendant stated the victim wanted to go outside to fight. He said the Defendant told him he pulled out his pocketknife when he was outside but did not

make any threats to the victim. He said the Defendant stated that he did not go back into the restaurant and that he was not waving or threatening with the knife when he was outside or when law enforcement arrived. He said the Defendant admitted that he had been drinking and that the altercation arose over a fish on the wall. He said he did not think that the Defendant gave him a list of witnesses because the witnesses were from out of state or the Defendant did not have their addresses. He did not believe that he talked to the other people at the Defendant's table because he had no notes about interviewing them.

Trial counsel testified that the public defender's office employed an investigator, Becky Nolan, who interviewed Charlie Stout and a waitress. He said Nolan made a diagram of the area. He said Nolan reported the following: The Defendant stated to Charlie Stout that he had killed before and would kill again and that he would cut the victim from ear to ear. Stout said that the Defendant was very drunk and that he kept the Defendant from going back into the restaurant. The Defendant did not have his knife out when he was inside the restaurant. The victim and the other people at the restaurant were not drinking. Stout had not experienced problems with the Defendant until about three months before, when people started staying with the Defendant, partying and getting rowdy. Stout tried to get the Defendant to return to his boat.

Trial counsel testified he discussed Nolan's report with the Defendant. He said the Defendant denied making the statements about killing the victim and cutting his throat. He said he thought it was best not to call Charlie Stout as a defense witness. He said that Nolan was unable to locate any other eyewitnesses and that she did not interview the State's witnesses. He said they did not interview the victim's sister or brother-in-law and that their testimony at trial did not "add any damning testimony against" the Defendant.

Trial counsel testified that he first learned that Tammy Cupp had a Kentucky address after the trial, but he said he did not recall how he learned that information. He acknowledged that the Defendant may have pointed that out to him while the jury was deliberating. He said he reviewed the juror list before the trial and during voir dire and did not see that information. He said he was familiar with the law concerning aggravated assault and assaultive defenses and that the Defendant's trial was not the first aggravated assault case he had handled. He said he advised the Defendant that the victim could not have been in imminent danger of death or bodily injury because the Defendant was outside. He said all the proof was that the Defendant was outside when he pulled the knife. He said he thought there was no testimony from which a jury could construe an aggravated assault and he had "thought that was a pretty good argument but obviously, it wasn't."

Trial counsel testified that he filed a motion in response to the State's motion regarding the Defendant's prior convictions. He said that as a result of the hearing on the

motion, he knew that some of the Defendant's prior convictions would be allowed into evidence and that it would not have been to the Defendant's advantage to testify. He said that he was sure he discussed the convictions with the Defendant. He said that after the trial, he told the Defendant that the process would be to complete paperwork for the presentence report and that he would set a date for the sentencing hearing. He said he told the Defendant that he would get the presentence report and review it with the Defendant before the hearing. He said that to the best of his recollection, he did so. He said that he no longer represented the Defendant at the time of the sentencing hearing. He said that if he had to do the trial over again, he would not make any changes. He said he thought that his argument was a good one and that the facts, even from the State's side, were favorable to his argument.

On cross-examination, trial counsel testified that he did not know how many cases the public defender's office handled the previous year, but he said that they handled about twenty to thirty cases every Tuesday. He said that at the time of the trial, the public defender's office employed one investigator. He agreed that he called no witnesses. He said that no one was able to interview any of the people at the Defendant's table because the Defendant did not provide names or addresses or any means by which to locate them. He said that if the Defendant provided information, he would have tried to contact the witnesses. He agreed that Charlie Stout was present at the trial but that the State did not call him as a witness. He agreed that he could have called Stout as a witness for the defense, but he said that the testimony was not in dispute: the knife did not come out of the Defendant's pocket until he was outside the restaurant, and the Defendant was outside with Stout until Deputy Monger arrived. He acknowledged that he offered no testimony to rebut that the victim had a clear view of what transpired outside the restaurant. He agreed that the crux of the case was the knife. He did not recall whether he cross-examined the victim about whether the victim feared for his safety. He said the basis of his defense theory was that everything happened outside the restaurant and that there was no way the victim reasonably could have been in imminent fear of death or serious bodily injury. He agreed that he did not personally interview any of the witnesses because Ms. Nolan interviewed them. He did not recall whether he cross-examined the victim about a prior inconsistent statement.

Trial counsel testified that he conducted voir dire with the jury pool and that he assumed everyone on the jury list was a Campbell County resident. He said he was unfamiliar with the statute that required the State to file certified copies of prior convictions. He said that he did not make a motion for a directed verdict or for judgment notwithstanding the verdict. He agreed that he researched the lesser included offenses that were discussed before the jury instructions were given. He said he did not offer any type of jury instruction to the court or request a special instruction. He said he hoped that the Defendant would be found not guilty of aggravated assault and instead that he would be found guilty of

misdemeanor assault. He said he also hoped that the Defendant would be acquitted because the State failed to prove its case.

Tammy Cupp testified that she resided in Williamsburg, Kentucky, and lived there for about four or five months. She said that at the time of the trial, she lived at 235 Morton Lane in Jellico, Tennessee, and was a Tennessee resident. She said she lived at the Morton Lane address for four or five years. She said the post office box mailing address on the jury questionnaire was located about fifteen minutes by interstate from her home. She said that she worked in Kentucky for the Whitley County Board of Education and that she also managed an apartment complex there. She said she would stay at the apartment complex during the first week of each month in order to collect the rents. She said that at the time of the trial, she held a Tennessee driver's license and was registered to vote in Tennessee. She said she obtained a Kentucky driver's license and voter registration about four months before the hearing on the motion for new trial, when she moved to Kentucky permanently. She agreed that she did not know the Defendant before the trial and that she had no animosity, bias, or prejudice against him. She agreed that the verdict was based solely on the evidence and the law.

On cross-examination, Ms. Cupp testified that she was staying in Kentucky some at the time of the trial. She said she managed the apartment building for about seven years. She said that she and her husband were building a house in Kentucky and planned to move by the end of the month, which had caused her to obtain a Kentucky driver's license and voter registration. She said she no longer traveled between Tennessee and Kentucky. She said that after she served on the jury, a woman called from the court asking for a mailing address to send jury pay. She said that she preferred to have the mail delivered to the post office box. She said she assumed the clerk's office initially obtained her information from her driver's license. She said that when she filled out the court paperwork, she provided her Tennessee address. She recalled being placed under oath and the trial court's asking if all the jurors present were from Tennessee. She said she had lived in Tennessee about four years at that time.

When asked her impression of the Defendant's attorney during trial, Ms. Cupp testified that she did not understand the question. She said she thought the jury did not get a lot of information about why the Defendant slapped the victim, other than it involved a conversation about a fish. She recalled that the jury presented a question to the court during deliberations about the difference between aggravated assault and assault. When asked if the jury received guidance about how to resolve that issue, she said that the trial court referred them to the definitions already given and that they had to make their decision based upon the testimony.

-20-

The trial court found that the juror was a Tennessee resident at the time of the trial and was qualified to serve as a juror. The court accredited trial counsel's testimony over the Defendant's testimony and found that the Defendant received the effective assistance of counsel. The court concluded that counsel's performance was not deficient and that counsel's decisions during the trial were tactical ones about which the Defendant was consulted.

This court has been hesitant to address claims of ineffective assistance of counsel raised on direct appeal, instead of in post-conviction proceedings. See, e.g., Thompson v. State, 958 S.W.2d 156, 161 (Tenn. Crim. App. 1997); State v. Anderson, 835 S.W.2d 600, 606-07 (Tenn. Crim. App. 1992). Nevertheless, there is no prohibition against litigation of ineffective assistance of counsel claims in conviction, as opposed to collateral, proceedings. See, e.g., State v. Burns, 6 S.W.3d 453, 461-63 (Tenn. 1999) (granting relief in direct appeal on ineffective assistance of counsel claim).

The same standard applies to claims of ineffective assistance of counsel raised on direct appeal. See Burns, 6 S.W.3d at 461 n.5. The burden in a post-conviction proceeding is on the petitioner to prove the facts of counsel's alleged error by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006); Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009). Once a petitioner establishes the fact of counsel's error, the trial court must determine whether the errors resulted in the ineffective assistance of counsel. Dellinger, 279 S.W.3d at 293; see Strickland v. Washington, 466 U.S. 668, 687 (1984).

On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland, 466 U.S. at 687; see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong

requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. Failure to satisfy either prong results in the denial of relief. Id. at 697.

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); see DeCoster, 487 F.2d at 1201.

We conclude from our review of the record that the evidence does not preponderate against the trial court's findings. The trial court accredited trial counsel's testimony. The Defendant claims that trial counsel failed to interview witnesses. However, the Defendant failed to provide names or addresses of witnesses other than Charlie Stout. No such witnesses were called to testify at the hearing on the motion for new trial, and the Defendant has failed to show prejudice. See Black v. State, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990). In addition, defense counsel's argument that trial counsel did not cross-examine the victim about an allegedly inconsistent statement made at the preliminary hearing is in error. The record reflects that trial counsel cross-examined the victim about his preliminary hearing testimony. We hold that the Defendant was not denied the effective assistance of counsel and that he is not entitled to relief on this issue.

In consideration of the foregoing and the record as a whole, we affirm the Defendant's convictions, but we remand the case for resentencing for the aggravated assault conviction.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE